NORTHWESTERN PUBLIC SERVICE
COMPANY, Petitioner,

v.

FEDERAL POWER COMMISSION,
Respondent,

Kansas-Nebraska Natural Gas
Company, Inc., Intervenor.

No. 74–1725.

United States Court of Appeals,
District of Columbia Circuit.

Argued April 7, 1975.

Decided Nov. 10, 1975.

Sheldon A. Zabel, Chicago, Ill., with whom James M. Van Vliet, Jr., Chicago, Ill., was on the brief for petitioner.

A. Lee Wallace, III, Atty., Federal Power Commission, with whom Drexel D. Journey, Acting Gen. Counsel and George W. McHenry, Jr., Sol. Federal Power Commission, were on the brief for respondent. William J. Grealis, Atty., Federal Power Commission, also entered an appearance for respondent.

John P. Furman, Washington, D. C., for intervenor.

Before ROBINSON and ROBB, Circuit Judges, and SOLOMON,* Senior United States District Judge for the District of Oregon.

ROBB, Circuit Judge:

This is a petition by Northwestern Public Service Company to review orders of the Federal Power Commission. We affirm.

Northwestern Public Service Company (Northwestern) distributes natural gas to retail customers in and around Grand Island, Kearney and North Platte, Nebraska. Northwestern buys all the gas it supplies to these customers from Kansas-Nebraska Natural Gas Company (Kansas-Nebraska), an interstate pipeline. Kansas-Nebraska's sales of gas to Northwestern are subject to regulation by the Federal Power Commission (FPC) under the Natural Gas Act (Act), 15 U.S.C. §§ 717 et seq. (1970).

From December 1, 1972 to December 1, 1973 the service agreement between Northwestern and Kansas-Nebraska entitled Northwestern to a "contract demand" of 49,000 mcf of gas per day supplied by Kansas-Nebraska on a firm commitment, year-round basis under its CD–2 rate schedule. Northwestern's actual daily entitlement, called its "billing demand", was a seasonally-adjusted percentage of its contract demand. From November through March Northwestern's billing demand was equal to 100% of its contract demand; during April, May, September and October billing de-

---

* Sitting by designation pursuant to 28 U.S.C. § 294(d).

mand equalled 80% of contract demand; and during June, July and August billing demand was 60% of contract demand.[1] On peak days when the actual load on Northwestern's system exceeded its billing demand Northwestern obtained additional gas from Kansas-Nebraska on an interruptible basis under Kansas-Nebraska's IOR–2 rate schedule.

Paragraph 5(b)(1) of Kansas-Nebraska's CD–2 rate schedule provides for increases in the contract demands specified in Kansas-Nebraska's service agreements with its various customers:

If Buyer shall wish to increase its Contract Demand, it shall on or before February 15 in any year notify Seller as to the total amount of such desired increase and the amount of the desired increase applicable to each Point of Delivery. Seller agrees to determine the practicability of supplying the increased Contract Demand desired by Buyer and by Seller's other firm gas customers and to notify Buyer not later than June 1 of such year of its conclusions with respect thereto. Such increase, if any, in Buyer's Contract Demand shall become effective on the first day of the following December or in the event Seller is not able to supply such increased Contract Demand on the first day of the following December, then on the first day of January next ensuing such month of December; provided, however, in the event that Seller is not able to supply such increased Contract Demand on or before the first day of said month of January, then such increase in Buyer's

Contract Demand shall not become effective until the first day of the month of December next ensuing the date when Seller is able to supply such increased Contract Demand, by which last said date Seller shall make such increased capacity available to Buyer.

Pursuant to this provision Northwestern wrote to Kansas-Nebraska on February 7, 1973, requesting an increase of 2,000 mcf per day to be effective, if granted by Kansas-Nebraska, beginning December 1, 1973. Five other customers also requested increases in their CD–2 contract demands. The six requests together totaled 5,184 mcf of gas per day.

Apprehensive of its ability to continue to meet the increasing demand for gas in the face of steadily declining reserves, and concerned that additional gas provided in the warmer months of the year might be sold to low priority industrial users, Kansas-Nebraska decided as a matter of policy not to increase contract demands further. Instead, on February 23, 1973, Kansas-Nebraska applied to the FPC for a certificate of public convenience and necessity to provide a new Winter Period Service (WPS) to its jurisdictional customers. Under WPS Kansas-Nebraska proposed to offer additional gas on a firm commitment basis for the limited period from November 1 through the following March 31 to any of its customers purchasing gas under its year-round CD service. Kansas-Nebraska estimated that its customers would request approximately 5,000 mcf of gas per day under WPS. Kansas-Nebraska explained its application as follows:

---

1. When this case arose Kansas-Nebraska's tariff structure was divided into two geographical zones. The CD rate schedules in each zone differed in design. In Zone 1 billing demand always equalled 100% of contract demand; but in Zone 2, in which Northwestern was located, billing demand was a seasonally-adjusted percentage of contract demand. Also, the cost of gas supplied under the CD rate schedule applicable in Zone 2 (CD–2) was greater than the cost of gas supplied under the CD rate schedule applicable in Zone 1 (CD–1).

The FPC is currently reviewing Kansas-Nebraska's tariff structure in Docket No. RP72–

32. In Opinion No. 731, filed May 15, 1975, the FPC approved Kansas-Nebraska's tariff structure in part and disapproved it in part. Specifically, the FPC found that the cost differential between the two zones was unjustified. The FPC also expressed doubt that the geographical boundaries of the two zones could be justified, but reserved final decision pending a fuller investigation in another proceeding, Docket No. RP74–11. The FPC approved the seasonal design of the Zone 2 rate schedule. Kansas-Nebraska has applied for rehearing in Docket No. RP72–32.

Applicant considers it prudent to restrict the growth of its sales and its customers' sales to large industrial plants, particularly those using gas as boiler fuel. For that reason it has adopted a policy of not offering to increase contract demands under its CD rate schedules which are for year-round service. Increasing contract demands under the CD rate schedules would make additional gas available throughout the year and permit the distributors to make additional off-peak sales from the additional valley gas. Applicant believes it desirable and prudent, to the extent that available gas supplies will permit, to permit increases in sales for residential and small commercial customers, the requirements of such customers being mostly for space heating. . . . Applicant believes that a better solution to this problem is the WPS rate which it is proposing to offer to all jurisdictional customers.

Northwestern intervened in the WPS proceeding to oppose Kansas-Nebraska's application.

On May 29, 1973, while Kansas-Nebraska's application for a certificate authorizing it to offer WPS was pending decision by the FPC, Kansas-Nebraska informed Northwestern by letter that Northwestern's request for an increase in its contract demand was denied:

We wish to notify you that Kansas-Nebraska has determined that, in view of present gas supply conditions and prospects, we do not consider it practicable or prudent to agree to supply increased Contract Demands which would entitle buyers to receive additional firm gas on a year-round basis.

In response Northwestern filed a complaint with the FPC alleging that Kansas-Nebraska's refusal to increase Northwestern's contract demand was an unjust, unreasonable and unduly discriminatory practice in violation of section 5(a) of the Act, 15 U.S.C. § 717d(a).[2] Northwestern claimed that by offering to provide additional gas under WPS Kansas-Nebraska admitted the practicability of increasing the volume of gas it supplied to its customers, and that Kansas-Nebraska's refusal to grant an admittedly practicable increase in Northwestern's contract demand constituted a violation of Kansas-Nebraska's CD–2 rate schedule, and consequently a violation of section 5(a) of the Act. Northwestern also claimed that Kansas-Nebraska had not refused year-round volume increases to its non-jurisdictional customers, and thus had discriminated against its jurisdictional customers, also in violation of section 5(a) of the Act. Northwestern asked the FPC to order Kansas-Nebraska to increase Northwestern's contract demand by 2,000 mcf of gas per day.

Kansas-Nebraska filed an answer to Northwestern's complaint and a motion to dismiss. Kansas-Nebraska stated that its steadily declining gas reserves had forced it to take actions to reduce the possibility that the gas is supplied to its customers would be resold to low priority users. Since increasing year-round

---

2. Section 5(a) of the Act provides:

Whenever the Commission, after a hearing had upon its own motion or upon complaint of any State, municipality, State Commission, or gas distributing company, shall find that any rate, charge, or classification demanded, observed, charged, or collected by any natural-gas company in connection with any transportation or sale of natural gas, subject to the jurisdiction of the Commission, or that any rule, regulation, practice, or contract affecting such rate, charge, or classification is unjust, unreasonable, unduly discriminatory, or preferential, the Commission shall determine the just and reasonable rate, charge, classification, rule, regulation, practice, or contract to be thereafter observed and in force, and shall fix the same by order: *Provided, however,* That the Commission shall have no power to order any increase in any rate contained in the currently effective schedule of such natural gas company on file with the Commission, unless such increase is in accordance with a new schedule filed by such natural gas company; but the Commission may order a decrease where existing rates are unjust, unduly discriminatory, preferential, otherwise unlawful, or are not the lowest reasonable rates.

contract demands in order to provide sufficient gas for high priority users in peak seasons would also result in the availability of excess or "valley" gas for sale to low priority industrial users in off-peak seasons, Kansas-Nebraska stated that it had determined that such increases were impracticable and should be denied. The practicable solution, Kansas-Nebraska alleged, was to provide increased volumes of gas for peak season high priority use under WPS. Kansas-Nebraska claimed that in adopting this solution it had not discriminated against its jurisdictional customers, but that it had adopted the same policy toward its non-jurisdictional customers.

Replying to Kansas-Nebraska's motion to dismiss, Northwestern maintained that Kansas-Nebraska's proposal to offer additional gas under WPS established that Kansas-Nebraska was able to supply its customers with some additional gas. Kansas-Nebraska's CD-2 rate schedule required, Northwestern argued, that upon request such additional gas must be supplied as increased contract demands rather than under Kansas-Nebraska's new WPS-2 rate schedule.

Before a hearing was held on Northwestern's complaint, the FPC issued a certificate of public convenience and necessity authorizing Kansas-Nebraska to offer WPS to its jurisdictional customers. Without prejudicing its section 5 Complaint Northwestern requested 1,000 mcf of gas per day under the new WPS. On December 4, 1973, the FPC approved Northwestern's request along with five others, all totaling 5,484 mcf of gas per day.[3] *Kansas-Nebraska Natural Gas Company, Inc.,* 50 F.P.C. 1779 (1973).

On December 14, 1973, the Administrative Law Judge (ALJ) issued his initial decision on Northwestern's complaint. The ALJ found that in determining the practicability of increasing

contract demands under its CD-2 rate schedule Kansas-Nebraska was entitled to and properly did consider factors other than the mere availability of additional gas.

Kansas-Nebraska supports its refusal to furnish additional contract demand service on the basis of present gas supply conditions and prospects, and in light of the fact that its reserve life ratio has been declining. It asserts that its action responds directly to the suggestion of the Commission in its Notice of Proposed Policy Statement, issued January 8, 1973, in Docket No. R-457, that consideration be given to "the use of monthly or seasonal demands", instead of annual contract demands as a means of gas conservation. Furthermore, Kansas-Nebraska eschews increases of contract demand under the CD Rate schedules as this would increase the "valley gas" available to customers during non-winter months and thereby encourage off peak sales for low priority purposes.

.    .    .    .    .

.    .    . The factors cited by Kansas-Nebraska for its determination that contract demand should not be increased are, under the circumstances presented, reasonably within the meaning of ["practicability"].

[Footnotes omitted.] Moreover, the ALJ found that the reasonableness of Kansas-Nebraska's decision was supported by its offer to supply additional gas under WPS in order to permit growth in high priority sales without permitting sales to low priority users. Finally, the ALJ found that Northwestern had failed to introduce any evidence that Kansas-Nebraska had discriminated against its jurisdictional customers in favor of its non-jurisdictional customers. The ALJ concluded that Kansas-Nebraska had not vi-

---

**3.** It should be noted that although the daily volume of gas authorized under WPS was nearly equal to the increase in daily volume requested by Kansas-Nebraska's customers in their contract demands, the annual volume of gas to be supplied under WPS (5,184 mcf/day × 151 days = 782,784 mcf) was substantially less than half the increase in annual volume which would have resulted from increasing contract demands (5,484 mcf/day × 365 days = 2,001,660 mcf).

olated section 5(a) of the Act and accordingly denied the relief requested by Northwestern.

The FPC issued orders affirming and adopting the initial decision of the ALJ and denying Northwestern's application for rehearing. Northwestern petitions for review of these orders.

## I. The Tariff Violation Issue

Northwestern argues that the FPC erred in defining and applying the practicability standard governing increases in contract demands under Kansas-Nebraska's CD–2 rate schedule. Specifically, Northwestern argues that the FPC refused to accept the ordinary meaning of "practicability" even though there was no evidence that a special meaning was intended. As to whether it was practicable, within the ordinary meaning of the word, for Kansas-Nebraska to increase Northwestern's contract demand, Northwestern argues that Kansas-Nebraska's offer of WPS established conclusively that Kansas-Nebraska had additional gas available for supply to its customers and that therefore at least some increase in contract demands was necessarily practicable. Further, Northwestern contends that, contrary to the FPC's finding, the factors upon which Kansas-Nebraska relied in denying Northwestern's requested increase in its contract demand did not support the decision to refuse the request as impracticable. Finally, Northwestern complains that the effect of the FPC's orders is to force Northwestern to use WPS although WPS will cost more and permit less market growth than an increase in Northwestern's contract demand.

Although the FPC found that "[t]he definition of the term 'practicability' in paragraph 5(b)(1) of the tariff set forth by Northwestern is . . . unreasonably restrictive", it is clear from the context in which this finding appears that in spite of its literal language the FPC rejected not Northwestern's definition of "practicability" but rather Northwest-

ern's application of the practicability standard. The FPC agrees with Northwestern that Kansas-Nebraska must increase Northwestern's contract demand at the latter's request if practicable, that is, if Kansas-Nebraska is *able* to increase Northwestern's contract demand. The disagreement is over what factors Kansas-Nebraska may consider in determining that it is not able to increase contract demands, and whether in this case those factors support Kansas-Nebraska's decision not to increase Northwestern's contract demand.

It is true, as Northwestern argues, that Kansas-Nebraska's offer of WPS conclusively established that Kansas-Nebraska was able to offer some additional gas to its customers. To conclude from that, however, that Kansas-Nebraska was therefore necessarily able to increase Northwestern's contract demand is to misread the practicability standard in Kansas-Nebraska's CD–2 rate schedule. Under that standard Kansas-Nebraska was not required to determine the practicability of supplying additional gas to its customers, with the sole consideration being the availability of gas. Rather, Kansas-Nebraska was required to determine "the practicability of supplying the increased Contract Demand desired by Buyer and by Seller's other firm gas customers". The distinction between the two determinations is in when and how additional gas shall be supplied. The FPC found that in making the determination in this case Kansas-Nebraska properly considered three factors: (1) its "present gas supply conditions and prospects"; (2) the FPC's proposed policy statement in Docket No. R–457, "that consideration be given to 'the use of monthly or seasonal demands', instead of annual contract demands as a means of gas conservation"; and (3) the possibility that increasing contract demands would "encourage off peak sales for low priority purposes" in non-winter months. Northwestern does not argue that Kansas-Nebraska improperly considered these factors, but says

the factors do not support Kansas-Nebraska's decision.

With regard to the first factor, two facts are beyond dispute in this case: that Kansas-Nebraska's gas reserves were steadily declining, and that it still had some additional gas for its customers. Thus, although it was clearly possible for Kansas-Nebraska to supply additional gas to its customers, it was equally clearly impracticable to do so at the risk of seriously depleting reserves by low priority sales. In balancing these two considerations Kansas-Nebraska decided to offer additional gas under WPS rather than through increased contract demands. That decision made additional gas available to Kansas-Nebraska's customers to allow for growth in high priority use while at the same time reducing the possibility of off-peak low priority sales.

■ As for the second factor, Northwestern argues simply that a proposed policy statement by the FPC cannot be held to have any binding effect on Kansas-Nebraska in this case. Although Northwestern is unquestionably correct on this point, this does not mean that Kansas-Nebraska was barred from even considering the suggestions made by the FPC in its policy statement. There is no evidence that Kansas-Nebraska considered itself bound to adhere to any FPC policy. Kansas-Nebraska relied on the FPC policy statement merely for additional support in making its decision.

■ Enough has already been said to show that the third factor which Kansas-Nebraska considered provided additional support for its decision. Obviously, if Northwestern's daily volume of gas were increased in winter and summer alike, Northwestern would have additional gas during the summer when high priority residential use would be lowest. In refusing to increase the volume of gas available in the summer Kansas-Nebraska reduced the possibility of low priority sales. Northwestern argues that this was unnecessary in light of its assurances that it would not sell additional gas to low priority users. However, Northwestern again misreads the practicability standard which requires Kansas-Nebraska to consider, in determining whether to increase one customer's contract demand, the increases requested by all its customers. Northwestern's assurances do nothing to protect against low priority sales by other customers. They would do little enough anyway, since they would be extremely difficult to enforce. Kansas-Nebraska was not required to rely on such uncertain promises when a surer method of achieving the same result was readily available.

■ Finally, Northwestern asserts that Kansas-Nebraska's decisions to refuse to increase contract demands and to offer WPS instead will increase the total cost of gas purchased by Northwestern and greatly restrict its market growth. This assertion is puzzling. Northwestern cannot complain of increased rates unless it contends that the increased rates are unjust and unreasonable in violation of section 4(a) of the Act, 15 U.S.C. § 717c(a) (1970). We do not understand Northwestern to make this contention, but if it did, it would better be made in the separate rate proceedings involving Kansas-Nebraska currently pending before the FPC. Also, the Act does not guarantee Northwestern an adequate supply of gas for its market growth, and in this age of widespread curtailment Northwestern can hardly complain that its capacity for market growth has been reduced. In any event, the record does not support Northwestern's assertion. At best the evidence on Northwestern's costs and growth is inconclusive. And even if Northwestern's assertion were correct, it would be irrelevant in this case. The question here is whether Kansas-Nebraska properly refused to increase Northwestern's contract demand on the ground that such an increase would be impracticable. Northwestern's costs and growth have nothing to do with the practicability of Kansas-Nebraska's increasing contract demands.

In sum, we are unpersuaded by Northwestern's arguments. We conclude that on the basis of the record before it the FPC properly found that Kansas-Nebraska's refusal to increase Northwestern's contract demand under the CD–2 rate schedule was not unjust or unreasonable in violation of section 5 of the Act.

## II. The Undue Discrimination Issue

Northwestern argues that the FPC refused to rule on the issue of whether Kansas-Nebraska treated its non-jurisdictional customers differently from its jurisdictional customers, unduly discriminating against the latter. The FPC argues that it has no jurisdiction over such discrimination, and that in any event Northwestern failed to show by evidence in the record that Kansas-Nebraska did discriminate between its jurisdictional and non-jurisdictional customers.

We question whether under section 5 of the Act the FPC has jurisdiction over a complaint alleging that a pipeline has discriminated in its terms of service between its jurisdictional and non-jurisdictional customers. However, the FPC did not rest its decision in this case on jurisdictional grounds, and neither do we. Our own review of the record discloses no persuasive evidence of any discrimination. Instead, witnesses for Kansas-Nebraska testified repeatedly that Kansas-Nebraska's policy was to treat its non-jurisdictional retail customers the same way that its jurisdictional customers treated their retail customers. Northwestern did not refute that testimony. The FPC properly found that Northwestern failed to demonstrate any undue discrimination.

## III. Conclusion

We have carefully considered all Northwestern's arguments and are unable to find merit in any of them. We hold, therefore, that the FPC's orders in this case must be

*Affirmed.*